MEMORANDUM OF DECISION 
This case presents petitions for the termination of the parental rights of Tina A, and William N. to their two children, Virginia N., known as Gina, and William N., Jr., known as Billy. The children are now ages six and five respectively. These children came into the care of the Department of Children and Families, hereafter "DCF", on July 25, 1996 after their mother, Tina A., had been out of the state for six months, leaving the two children in the care of others. The children's last caretaker was their grandmother, who contacted DCF as she was unable to care for them. The children were adjudicated neglected and uncared-for children on March 24, 1997 (Wiese, J.) and committed CT Page 12183 to the care and custody of DCF. They have remained in foster care since July, 1996.
DCF filed termination petitions on December 19, 1997, alleging that the children have been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children. Also, DCF alleges the children were previously adjudicated neglected and that each parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, such parent could assume a responsible position in the life of the children. The last allegation is that there no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the children. Connecticut General Statutes § 17a-112(c)(3)(A), (B) and (D).
The court finds that William N. was personally served with the petitions. Further, service on Lisa A. was by publication in the Times Herald, a newspaper with general circulation in St. Clair County, Michigan, Tina's last known place of residence. The court finds there was proper service in accordance with the statutes and that it has jurisdiction in this matter. The parents have both appeared and have court-appointed attorneys. William N. did not attend the trial, although his counsel was present. The mother, Tina A., attended, having traveled from Michigan to do so. The court further finds that there are no other pending proceedings effecting the custody of these two children.
The court received thirteen exhibits and heard the testimony of two DCF social workers, the present foster father of both children and a therapist for the children. After the commencement of trial on October 27, 1998, Tina A. consented to the termination of her parental rights to both children. The court found that her consent was knowingly and voluntarily made, with the advice of competent counsel, and with a full understanding of the consequences of her act. The court accepted the consents and permitted the amendment of the petitions to allege her consent.
 1. FACTS
CT Page 12184
The biological parents of the children had a relationship extending from at least 1991 to 1996. They never married and their relationship was marked by domestic violence, alcohol and drug abuse. While Tina's childhood generally followed a normal course, William N. was himself a foster child and in residential care in Connecticut from age four to age eighteen. He retains strong negative memories of his institutional life and does not want the same outcome for his children. He is now thirty-seven years old and has been incarcerated in Florida for assaulting Tina and in Connecticut on drug-related charges. His most recent conviction was in April, 1997, when he was sentenced to six months imprisonment for possession of narcotics. During the pendency of the neglect and termination proceedings, he has variously been homeless, residing with his mother, incarcerated and also living alone in a small apartment. He has had minimal employment during these years.
From time to time since 1997, William N. has expressed interest in his children but that interest was sporadic and fraught with problems; in particular for William, Jr. whose paternity he denied to the child himself. William had no contact with his children at least from 1996 to January of 1997, when he contacted DCF for the first time. He did not request visitation until the late summer of 1997, when visitation was arranged for him. The social worker testified that at the first visit, Gina did not know that he was her father and Billy clearly had no memories of him. As set forth in the service agreement DCF entered into with him[2], he was required to call to confirm visitation, which was scheduled on a weekly basis. In total, he had three visits between August and November and there were three missed visits, when he did not show and one visit where he came to visitation, but had not called to confirm so that the children had not been brought from their foster home to the DCF office for visitation. The last time William saw his children for a visit was on January 28, 1998. In addition, William did not call, send cards or gifts, contact DCF about the children's welfare or express any other ongoing and sustained interest in the children.
The DCF social worker testified that William disappeared for months at a time. There were court expectations entered for William in 1997, which required him to have a substance abuse evaluation, attend parenting classes and therapy. He only fitfully and marginally attempted to comply and never completed a drug and alcohol evaluation, which had to be rescheduled for him CT Page 12185 in 1998, when he failed to attend the first session. From the testimony, it is clear that William demonstrated no desire to benefit from these services, and did not comply with them. He has stated to the DCF worker his desire to have the children with him, but has also admitted that he could not control his son and would not able to care for this child. His failure to attend the trial, about which he had been informed, is consistent with his previous conduct and an expression of his lack of commitment and ability to sustain his interest in his two children.
At the time the children of this family came into foster care, they exhibited the consequences of the chaotic life they had led; without regular and committed parenting. Both were placed together and their present home is their third foster home placement, where the children have been for one and one-half years. Their first placement came to an end when it was discovered that other children in the household physically abused them. Gina and Billy were then in a temporary placement for less than a week. Since April, 1997, they have lived with their present foster parents, where they have begun to develop more normal behavior patterns.
Gina, her foster father reported, was hyper and not easy to control. She masturbated excessively and required special care in school, as she could and would not follow the directions of the teachers there. He stated that you could not initially seat her at the table with food to eat, for she would make a grab at everything. With counseling and regular intervention, her out-of-control behaviors have abated. She is doing well now, both at home and in school. At home she enjoys helping her foster mother with the household chores, like washing dishes and helping with the cleaning. In the beginning she talked about her father, not so much her mother, her foster father testified. In the last seven months or so, he stated, she has not mentioned either of her parents or asked about them. She is now in first grade and doing well. She attends church with the family and is very close to her younger brother, who continues to have behavioral problems.
The foster father stated that William, Jr. continues to be extremely hyper. He spoke poignantly of the time the child went to visit his father in jail and his father denied that Billy was his child. The child was very upset by this and Gina also questioned whether Billy was her brother. He testified that Billy is often unable to control himself. He is a constant behavior CT Page 12186 problem at school, where he is in kindergarten, because he will not obey the teachers. The foster father testified that he regularly goes to the school to intervene and that the only way to calm Billy is to physically hold him close to his body, embraced by both arms until he quiets, and to use "time-outs." William also will not permit women to exercise authority over him, and either he or the security guard at the school have to calm him down. He testified that the morning of the trial he had been at the school to persuade Billy to calm down and not tell his teacher to "shut up. " He testified that he saw some improvement with Billy, and that his school misbehavior is the one remaining crucial difficulty with this young boy.
The therapist who worked with both children testified that Billy has specialized needs and needs a lot of structure and love in his life. She stated that the children see their foster parents as their parental figures, as they are the individuals who provide them with the love and attention they need. In her opinion, she believed that permanency was in their best interest so that their foster parents could care for them until they were grown. When questioned as to whether or not the children should have future contact with their biological parents, she stated that the foster parents, who provide their daily care, should be the ones to make that decision.
 B. ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds, by clear and convincing evidence, that as of December 19, 1997, both children had been abandoned by their father. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). While William N. has expressed his interest in his children, that interest has been sporadic and not sustained. As has been stated: "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); In re Migdalia M., 6 Conn. App. 194, 208-209, 504 A.2d 532
(1986). These are all acts which William N. failed to take.
Based on clear and convincing evidence, the court concludes CT Page 12187 that William N has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his children, he could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). He has not begun the process of drug and alcohol rehabilitation, has not avoided further involvement with the criminal justice system, let alone be rehabilitated as a parent. The children were placed in foster care in July, 1996. More than two years have already passed since that date. These children simply cannot wait any longer for the rehabilitation of their father as they each have immediate and strong needs for permanency.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). There is no doubt that William N. has not begun the process to accomplish such an outcome. Rehabilitation within the foreseeable future is not likely. The court finds, based on the clear and convincing evidence, this ground had existed as to William for longer than one year prior to the filing of the termination petitions on December 19, 1997.
The third ground alleged is that there is no ongoing parent-child relationship. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Migdalia M.,6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3),1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). Given the testimony of the DCF social worker, there was no relationship between William N. and his children when the first visit took place while he was incarcerated. Certainly, he has done nothing to establish and maintain a consistent relationship since that time and, from the facts, the court concludes that there is no reasonable likelihood that he would do so at some point in the future. The court finds that this ground had also existed for a period of time greater than one year prior to the filing of the termination petitions in December, 1997. CT Page 12188
 C. REQUIRED FINDINGS
The court will make no findings regarding the mother, Tina A., as they are not required due to her consent to the termination of her parental rights. The court makes the following factual findings about William N. based upon the clear and convincing evidence required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including referrals to parenting classes, drug and alcohol treatment referrals, transportation assistance, visitation coordination and case work services.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. There were efforts made with the mother and the father. William received services for reunification, but did not begin to take the steps necessary to rehabilitate himself.
3) The Department set reasonable and realistic goals embodied in court-ordered expectations and in one service agreement in order to reunify the family. William N. did not avail himself of the programs offered and failed to comply with either the expectations or the service agreement obligations.
4) The feelings and emotional ties of the children with respect to the parents, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Both the children do not know their parents. They perceive their foster parents to be their parents, as these are the individuals who nurture and support them in their daily lives. The foster parents have indicated a willingness to adopt both children.
5) Finding regarding the age of the children. Gina is six years old and Billy is five.
6) Finding regarding efforts of the parent to adjust his circumstances, conduct or conditions to make it in the best interests of the children to return them to his home in the foreseeable future and (A) the extent to which the parent has CT Page 12189 maintained contact with the children as part of an effort to reunite the children with the parent, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. William N. had made only minimal efforts to maintain contact with his children in an effort to reunite with them. His visits have been sporadic and the quality of the visits that did take place often poor. There have been no visits since January, 1998. The court finds that William B. has been unable, as previously found, to adjust his conduct to make a return of the children to him feasible.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. No inappropriate conduct is noted. The Department has taken many steps to encourage both parents to have a meaningful relationship with their children.
 DISPOSITION
Gina and Billy have been in foster care for over two years. Both of them need the stability and consistency that are provided by their loving relationship with their foster parents and the stable home into which they have welcomed these children. Based upon the foregoing findings, the court determines that it is in the children's best interests that a termination of parental rights enter with respect to their mother, Tina A. and their father, William N. and, accordingly, a termination of their parental rights is ordered. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. If the foster parents continue to be willing to adopt Gina and Billy, it is the court's direction that they receive first consideration. A permanency plan for both Gina and Billy shall be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session — 10/30/98 final